**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Richmond Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | **Chapter 7** |
| **ROOMSTORE, INC.,** | * | |
| | | **Case No. 11-37790- DOT** |
| Debtor. | * | |
| * * * * * * | * | * * * * * * |
| **LYNN L. TAVENNER, Chapter 7 Trustee,** | * | |
| | * | |
| Plaintiff, | * | **Adv. Proc. No. 13-_____** |
| v. | * | |
| | * | |
| **STEVEN L. GIDUMAL** | * | |
| **8 River Terrace, 16th Floor** | | |
| **New York, New York 10282** | * | |
| | * | |
| Defendant. | * | |
| * * * * * * | * | * * * * * * |

**COMPLAINT**

Lynn L. Tavenner, the Chapter 7 Trustee for the bankruptcy estate of RoomStore, Inc. (the "Debtor," "RoomStore," or the "Company"), by undersigned counsel, files this Complaint seeking a money judgment against the Defendant, Steven L. Gidumal, and for cause states as follows:

**INTRODUCTION**

1.     In December 2011, RoomStore was a public company that operated sixty-six retail furniture stores in various parts of the country.  It had filed for Chapter 11 bankruptcy protection because, in part, it faced a dramatic financial decline and bleak

1

industry forecast in 2011 and 2012, and needed to preserve and maximize the value of RoomStore for its various stakeholders.

2.      Seven months later, in July 2012, RoomStore's bankruptcy case was converted to one under Chapter 7 and a trustee was appointed to liquidate the remaining assets of RoomStore's bankruptcy estate that had not already been wasted as a direct and proximate result of various acts of willful misconduct undertaken by RoomStore's Chairman of the Board of Directors (the "Board"), Steven L. Gidumal ("Gidumal" or the "Chairman").

3.      This Complaint seeks redress for Gidumal's egregious and willful misconduct and breaches of fiduciary duty that caused a substantial wasting of Roomstore's value, resulting from Gidumal's abject failure to develop, manage and oversee a bankruptcy process fair to all stakeholders.  Driven by self-interest and a personal desire to protect a return on his equity holdings in RoomStore and also obtain new equity ownership in a reorganized RoomStore that was premised upon a whimsical value of RoomStore's affiliate, Mattress Discounters Group, LLC ("MDG"), Gidumal willfully ignored significant strategic alternatives available to maximize value.

4.      Gidumal's failures were avoidable, and directly resulted in the tragic decline of the Company's value.  In sum, Gidumal's willful and reckless misconduct led the Company to a fire sale liquidation of its assets and incurring of additional debt.

5.      As a director of RoomStore, Gidumal owed fiduciary duties of care, loyalty, and good faith.  When RoomStore filed bankruptcy and became a debtor-in-possession, he owed a fiduciary duty to actively gather information, develop, and

2

manage a strategy to pursue and maximize the highest value for the Company.  This responsibility included the obligation to participate, actively and directly, in evaluations of strategic alternatives, the risks of a turnaround, and to examine, explore, understand, and become fully informed of the Company's options and values associated therewith. As he was advised by management and by independent professional bankruptcy advisors, these options included: (i) selling the Company as a going concern in whole or in parts; (ii) timely reorganizing the Company with fresh capital and financing; or (iii) engaging in an orderly liquidation, as opposed to a fire sale.

6.     As detailed further below, Gidumal consciously disregarded and abdicated his fiduciary duties by, among other things, ignoring two of the three alternatives – a going concern sale and orderly liquidation - effectively allowing RoomStore's fate and value for creditors to hinge upon the securing of adequate capital and financing, and successfully completing a risky turnaround when Gidumal knew the Company's performance was not only abysmal, but declining.   In fact, Gidumal conceded during the relevant time period that RoomStore's financial performance was "painful," "terrible," and "disappointing."  Simply put, while RoomStore's value during the bankruptcy was akin to a "melting ice cube", it was not lost on Gidumal that a going concern sale or orderly liquidation, even if it provided a higher value than a turnaround, would not allow him to reap a return on existing equity or succeed with his plan to acquire new equity in a restructured RoomStore.  As a result, Gidumal actively resisted any attempt to even examine or assess alternate strategies for maximizing value, and ultimately prevented such assessments.

3

7.      During the most critical time period for RoomStore, Gidumal delayed

analysis and assessment by the Board of strategic alternatives and imposed his will of

an attempted turnaround.  This unilateral decision-making by Gidumal motivated the

Company's CEO to issue a warning to Debtor's counsel that he was fearful that

Gidumal's actions had rendered the Board uninformed.  Gidumal's compulsive need

for control led to the Board's conduct being generally described as "dysfunctional" by a

senior RoomStore officer, and Gidumal's conduct, in particular, as "destructive."

8.      Gidumal's decision to limit the path of the Debtor solely to an attempted

turnaround occurred even though the Company's financial advisors and advisors for

RoomStore's Official Committee of Unsecured Creditors (the "Committee") told

Gidumal that a dual track approach to the pursuit of RoomStore's strategic alternatives

should be assessed to maximize value.  Indeed, as a result of the Committee's

skepticism of a feasible turnaround, it obtained a written agreement from the Debtor to

provide a timeline for a going concern sale process as a condition to refraining from

opposing a new credit facility for the Debtor.  Notwithstanding the Debtor's promise,

Gidumal specifically told the Company's advisors not to take the acts necessary to

comply with the express agreement.  The Committee remained so concerned about

eroding value that it warned RoomStore that there was "frustration of the Committee

with the lack of progress of the Debtor in exploring and preparing to execute alternative

strategies for exiting from bankruptcy.  The refusal of the Board to meet promptly and

address alternative strategies puts the creditors of the estate in a precarious position."

The Committee also made clear: "As I know you are aware, a debtor-in-possession has

the fiduciary duty to protect and maximize the assets of the estate.  The Committee views the consideration of a sale of the Debtor's assets as a going concern, including the remaining Texas assets, as an obligation of the Debtor's management under the Bankruptcy Code."

9.     Gidumal was also reminded that: "By your own advisors calculations, it is probable that the company may be running out of cash as early as April 1, 2012 and the debtor and the board do not appear to be developing any solutions to this potential liquidity crisis. . . .  We are not aware of the result of [a] Board meeting, but if the result was anything other than an agreement to pursue a dual track process for a going concern sale while the Debtor continues to review its reorganization options, then the Committee believes the Debtor is not meeting its fiduciary obligations to creditors. . . . [I]f the Board do[es] not move forward with exploring all options that will best preserve value for the benefit of the estate, then we may have litigation."

10.     Gidumal's utter failure to discharge his fiduciary duties to RoomStore was driven by his self-interested desire to protect his then-existing ownership interests in RoomStore and those of other investors with whom he consulted about the strategic direction of RoomStore and "ways to protect some ownership."  He focused on the interests of these shareholders despite repeated advice from restructuring and bankruptcy professionals to consider and explore alternate courses of action to preserve and maximize value for the benefit of RoomStore's bankruptcy estate and its creditors.

11.     In addition to his singular desire to seek to protect shareholder interests at a time when RoomStore was bankrupt, thereby requiring Gidumal to consider the interests

of creditors, Gidumal also sought to capitalize on an opportunity to purchase additional equity in a reorganized RoomStore for pecuniary gain. To do so, he steadfastly refused to sell one of RoomStore's primary assets, a majority ownership interest in MDG, so that his future ownership in RoomStore could be monetized through his perceived substantial value in MDG, which he calculated was as high as $120 million. Gidumal made clear that he would not sell MDG even if it meant the demise of RoomStore, and later revealed that he wanted to hold on to MDG at all cost because it could result in a return for equity holders.

12.    To accomplish his self-interested goals, Gidumal, among other things, refused to convene necessary and timely Board meetings to appropriately consider the strategic direction of RoomStore that would maximize value; refused to cooperate with the Committee; refused to follow advice of professionals; refused to allow fellow Board members to be involved in strategic decision-making for the restructuring process; refused to hold meetings of the Corporate Governance Committee that was created to ensure proper governance for the Board; refused to inform himself of material information required to make an informed and reasoned business decision; refused to evaluate the risks, alternatives and courses of action for RoomStore and its creditors; refused to timely hire an investment banker to find capital or buyers even though warned by the Debtor's financial advisor that delaying such hiring could moot a capital or sales process as an opportunity with resulting financial harm; controlled all material aspects of the plan of reorganization terms; and refused to seek advice or valuations from bankruptcy experts hired to advise the Company in the bankruptcy process.

13.     Instead, without any valuation of a reorganized RoomStore, and without any existence of a reasonable financial plan or model supporting the feasibility of a turnaround as justification for delay of a sale or orderly liquidation, Gidumal resolutely demanded that the Company attempt a turnaround to the exclusion of other viable alternatives designed to maximize the value of RoomStore.  Gidumal's hope of protecting ownership interest and turning around RoomStore, however, had significant, serious and known risks to the value of RoomStore.  After various misrepresentations of fact and the self-interested motivations of Gidumal came to light, the Debtor's lender and Committee forced the appointment of a trustee because the bankruptcy estate had declined to the point of having no alternative other than engaging in a fire sale liquidation at distressed values.

14.     Gidumal utterly failed to perform his fiduciary obligations owed to RoomStore and his decision-making was fraught with conflict, improper motive, and inaction constituting disloyalty, bad faith, and knowing disregard.  Gidumal's failures and inaction to discharge even the most basic fiduciary duties owed by a director of a debtor — to analyze and take steps consistent with maximizing value — was the proximate cause of RoomStore's bankruptcy estate's significant loss of value, increased debt obligations, and wasteful spending.

15.     By virtue of both his self-interest and failure to inform himself adequately of reasonably available information and failing to engage in proper corporate governance and decision-making with the full Board, Gidumal assumed the risk that his actions and omissions would harm RoomStore and its bankruptcy estate, thereby

excluding his conduct from application of any business judgment rule or other protections.

## JURISDICTION

16.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  The willful misconduct complained of arose in the Chapter 11 bankruptcy case pending in this Court and the Defendant regularly conducted and transacted business in the Commonwealth of Virginia, the location of RoomStore's headquarters, by, among other things, attending board meetings, managing the affairs of RoomStore through its headquarters in Virginia, and agreeing to provide corporate governance services to the Debtor and Debtor-in-Possession as a director under its corporate policies.

17.    Venue lies properly in this Court pursuant to 28 U.S.C. § 1409.

## THE PARTIES

18.    The Plaintiff is Lynn A. Tavenner, the Chapter 7 Trustee (the "Trustee" or the "Plaintiff") of the Debtor, who was appointed as trustee on July 24, 2012.

19.    Steven L. Gidumal is an individual and citizen of the United States who, on information and belief, resides in New York, New York.

20.    As of April 7, 2011, and at all times relevant to the misconduct alleged in this Complaint, Gidumal served on the Board of Directors of the Debtor and Debtor-in-Possession and beneficially owned 487,338 shares, or 4.99%, of equity in RoomStore through a private investment company, Virtus Capital, L.P. of which he was the founder, President, and Portfolio Manager.

21.    On December 3, 2011, just a week prior to the bankruptcy filing, Gidumal was elected Chairman of Roomstore's Board of Directors and remained in that position until the Trustee was appointed.

22.    Gidumal also served on RoomStore's Audit Committee, Compensation Committee, and Corporate Governance Committee.

## FACTUAL BACKGROUND

### The Company's History

23.    The Debtor was founded in 1992 in Dallas, Texas with four retail furniture stores by several members of the Richard B. Levitz family.  By late 1996, RoomStore had grown to ten stores and two warehouses, and was purchased in 1997 by Heilig-Meyers, one of the then-largest furniture retail companies in the country.

24.    Under Heilig-Meyers's ownership, RoomStore grew to thirty stores in Texas, Oregon, and Washington, and twenty-four stores in Maryland and Virginia, in part through the acquisition of Reliable Stores, Inc. (d/b/a/ The Hub).

25.    In August 2000, Heilig-Meyers filed for bankruptcy protection.  During the Heilig-Meyers bankruptcy case, the RoomStore locations in Washington and Oregon were closed, but it added locations through the conversion of certain Heilig-Meyers's stores to the RoomStore format.  During the almost five years in which RoomStore operated in bankruptcy, the company closed several under-performing stores and emerged from the Heilig-Meyers bankruptcy in June 2005 with sixty-three stores.

26.     The following year, in 2006, RoomStore purchased certain leases from Rhodes, Inc., a furniture retailer that had also filed bankruptcy.  And, in December 2008, RoomStore formed MDG to purchase inventory, seventy-three leases, and nine executory contracts from the then-bankrupt Mattress Discounters Corporation, which owned and operated numerous Mattress Discounters retail stores.

27.     RoomStore initially owned a 75% interest in MDG, which was reduced to 65% on January 1, 2010.  The remaining interest was held by an individual experienced in the furniture and bedding industry, Raymond Bojanowski.

28.      By the summer of 2011, RoomStore had cobbled together sixty-six furniture stores in eight states: Texas, Alabama, Florida, South Carolina, North Carolina, Virginia, Maryland, and Pennsylvania.  MDG operated eighty-three bedding stores in Virginia, Maryland, Washington, D.C., and Delaware.  By that point, the Company was saddled with an inefficient and expensive distribution structure, the result of its various acquisitions and expansions, and had numerous non-performing store locations.

## Overview of the Furniture Industry

29.     The furniture retail industry is very cyclical, and it is strongly tied to the housing market.  For instance, the U.S. furniture retail industry grew between 1998 and 2007 by approximately $27 billion, or a 45% increase.  RoomStore's directors believed that this growth was driven by the corresponding growth in the residential housing market during that same timeframe.

30.     In line with the housing market, furniture sales generally began to decline in the second half of 2006, just one year after RoomStore's emergence from bankruptcy. By 2007, the declines accelerated and furniture retailers experienced a further drop in sales.  For many furniture retailers, 2008 and 2009 were worse than prior years and double-digit sales declines were common.  Although there were some positive industry signs in the beginning of 2010, as the year passed, furniture sales overall dropped in tandem with housing sales throughout 2010.   This economic picture provided opportunity for strategic transactions, and some furniture retailers grew during this period.

31.     In the first half of 2011, housing sales continued to decrease nationally and were down by 6.3% in comparison to March 2010.  Growth of the national economy continued at a slow pace in the third quarter of 2011, while indicators within the national housing-market worsened slightly.  This significant downturn in housing was widespread throughout the United States, including RoomStore's regions, and unemployment and negative equity, paired with fragile consumer confidence, prevented the housing market from stabilizing.  Furniture, of course, is a discretionary, "big ticket" purchase item that consumers postpone when their economic prospects are uncertain.

32.     Moreover, global commodity prices for materials and supplies used in the furniture manufacturing process, including wood, foam, and steel were increasing, which negatively impacted RoomStore's margins.  To maintain overall gross margins, RoomStore attempted to increase prices, but doing so negatively impacted sales.

## RoomStore's Economic Environment

33.     The significant strain placed upon RoomStore by the macro-economic housing industry conditions was well-known to RoomStore's Board.  For instance, in its Form 10-K filed with the United States Securities and Exchange Commission on May 31, 2011, RoomStore noted that it faced a difficult retail environment and changing economic conditions that may further adversely affect consumer demand and spending, and as a result, adversely affect RoomStore's financial condition.  In other words, the Board knew of RoomStore's problematic financial future.

34.     As was noted in RoomStore's 2011 Form 10-K, starting in 2009 and continuing into the 2010 and 2011 fiscal years, RoomStore sustained significant losses from operations and there was no assurance that it would return to profitability.  In mid-2011, RoomStore continued to struggle financially and had to borrow under its credit facility with Wells Fargo Retail Finance, LLC ("Wells Fargo") to fund its operating losses.  With respect to borrowing, the interest expense for the company increased 80% to almost $1 million in fiscal year 2011, up from $535,000 in fiscal year 2010, resulting, in large part, from additional borrowings to cover its operating losses.

35.     As made clear in the Company's 2011 Form 10-K, the Board knew RoomStore needed additional sources of liquidity if operations did not improve, and that such liquidity would be derived from raising additional capital through the equity markets.

36.     Indeed, RoomStore experienced staggering losses from operations starting in 2009.  These losses totaled $18,344,000 in 2009, $10,331,000 in 2010, and $11,706,000 in

2011.  The net loss was $14,010,000 in 2009, $7,637,000 in 2010, and $12,380,000 in 2011.

During these same time periods, inventory levels dropped significantly from $54,698,000 in 2008, to $46,715,000 in 2009, to $45,005,000 in 2010, and to $44,106,000 in 2011.

37.     By the end of 2011 and into 2012, inventory levels had fallen to critically low levels.  On May 19, 2011, the Company was forced to lower its prices to move inventory and generate additional cash.   Less than two months later, the Board acknowledged that "sales were slow and below plan" and that "inventory was also down and there was very little availability remaining under the credit facility."   Three months later, these issues were still at the forefront of the concerns facing the company as the then-CEO, Mr. Kimbrell, reported on "recent sales, inventory levels, amounts due to trade vendors and landlords, and the current amount owed to Wells Fargo bank."  At that same meeting, Gidumal acknowledged the critical nature of the low inventory when he suggested preparing information for Wells Fargo to demonstrate the need for additional funding "to buy critical inventory."   On November 3 and 5, 2011, Mr. Kimbrell reported to the board that "[i]nventory levels and vendor shipments were a continuing concern, that certain overseas vendors had stopped shipping goods to the Company," and that "[d]ecreasing inventory was an ongoing concern, which was contributing to lower sales."

38.     RoomStore's significant inventory problems continued into 2012 and followed RoomStore into bankruptcy.  The lack of sufficient inventory was a known, long-standing, major obstacle to the Company's success that the Board failed to address.

At the March 7, 2012 Special Meeting of the Board, it was reported that a "key reason for weaker than expected sales is a lack of inventory to ensure quick delivery to customers.  A reasonable inventory level for the Company is $20 million; it currently has $13 million."  This is in contrast to the $44 million level of inventory RoomStore had at February 2011, and the $54 million of inventory it maintained in 2008.  As a result of the weak inventory, the company experienced an astonishing "24% sales order cancellation rate" and was forced to sell off floor samples.  Further, RoomStore had limited ability to adjust pricing in order to achieve greater profitability because the furnishings industry is highly competitive.

39.    Given the significant downturn in the industry, RoomStore's Board anticipated that fiscal year 2012 would be a difficult year with very fierce competition among its retail rivals.  Over the preceding several years, several large furniture retailers opened new stores in a number of RoomStore's markets.  Those store openings negatively affected RoomStore's sales, especially in markets where there had been no significant "big box" competition previously.  To counter this competition, RoomStore was required to renovate existing stores, move to better locations and open new stores, and advertise heavily in those areas.  By 2011, RoomStore was unable to successfully compete with its primary competition due to the lack of liquidity necessary to support operational changes.

40.    Moreover, in its 2011 Form 10-K, the Board acknowledged that RoomStore expected that the furniture industry would continue to be negatively impacted by the economy and the availability of credit to the consumer and the Board, on behalf of the

company, stated in the 2011 Form 10-K: "We do not foresee any significant increase in furniture retail sales in the near future . . . ."

41.     As time passed in 2011, the company continued to suffer.  Cash and cash equivalents were reported at $2.4 million for February 28, 2011, but just three months later they had been cut in half to $1.2 million.  During this same three month period to May 31, 2011, inventory levels dropped by $4.1 million as in comparison to inventory levels as of February 28, 2011, and accrued liabilities increased by $3.2 million during the same period.

42.     In September 2011, RoomStore entered into an amendment to the Loan and Security Agreement with Wells Fargo that added additional terms and conditions to the agreement, including periodic inventory appraisals and financial audits, minimum excess availability requirements, and the preparation of periodic budgets by the company's management for Wells Fargo.  In exchange, RoomStore was provided additional borrowing availability to support its losses.

43.     The additional borrowing, however, was insufficient to support or stem RoomStore's operating losses.  By November 30, 2011, its total assets had declined by over $25 million since February 28, 2011.  Inventory levels plummeted to just $23 million as of November 30, 2011, a 45.7% decline from February 2011, and continued to decline to a reported $18 million as of January 2012.  Accounts payable increased by $3 million, or 20%, resulting from the inability to pay vendors as invoices were submitted, and accrued liabilities increased by $6.2 million, or 35.3%.  Further, losses from operations almost doubled from $8.9 million to $15 million for the nine-month

reporting period ending November 30, 2010 in comparison to the nine-month reporting

period ending November 30, 2011, and for the same period, the net loss attributable to

the RoomStore operating segment grew more than 50% from $9.8 million in 2010 to

$15.9 million in 2011.

44.     Sales also decreased to $55.4 million for the three months ended

November 30, 2011 compared to $80 million for the same period in 2010, a decrease of

$24.6 million, or 30.7%.  For the nine-month preceding period, it had decreased by $57.1

million, or 25.4% over the prior year period.  The decrease in sales had a direct

correlation with the reduction in inventory levels because there was a lack of available

inventory to fill customer orders due to the decrease in funds available to purchase

inventory.  This problem was "exacerbated during the Company's Chapter 11

proceeding, as fees of professionals and other costs . . . made it increasingly difficult for

the Company to have sufficient inventory on hand to fulfill customers' orders. . . .

Without additional capital, the Company [would] continue to struggle with meeting

customer sales needs."  While this significant inventory problem was well known to the

Board and was routinely discussed as an obstacle to RoomStore's growth, the Board

implemented no solution.

**RoomStore Enjoyed a Multitude of Suitors in 2011**

45.     As RoomStore's business suffered, it became a target for a strategic

transaction.  Throughout 2011, the Company fielded interest from third parties

interested in purchasing either the entire Company or the Company's 65% interest in

MDG.  In February 2011, the Company received two unsolicited inquiries through

corporate counsel and one of RoomStore's directors regarding a possible sale of the Company.   In response to those inquiries, the Board directed the retention of an investment banking firm, Houlihan Lokey ("Houlihan"), and requested that it present the Board of Directors with strategic alternatives for the Company.   In April 2011, Houlihan presented the Board with various indications of interest from parties interested in a transaction involving either the sale of RoomStore in its entirety or the purchase of its 65% interest in MDG.  While only one suitor submitted a bid to purchase RoomStore in its entirety, several parties, including three financial buyers, expressed interest in being a "stalking horse" in a § 363 sale process in a prospective RoomStore bankruptcy.   Significantly, Houlihan outlined for the Board that the imminent and "distinct possibility" of a liquidity crisis "would pose a serious threat to the pursuit of any alternatives" it presented.  Houlihan also warned that maintaining the *status quo* required "immediate turnaround" in the business, would not solve many of RoomStore's broader issues, required concessions from Wells Fargo and required confidence in the ability to achieve operational turnaround in the "immediate future."

46.     Of particular note, Houlihan advised the Board that more suitors would be interested in RoomStore if it filed bankruptcy.   It explained that buyers were reluctant to bid on RoomStore in the absence of a bankruptcy process because the Company had many underperforming store locations with long term real estate leases, which leases could be rejected and cancelled in a bankruptcy process.   Moreover, buyers were concerned with the ability to obtain shareholder approval of the sale in light of the value to shareholders existing at the time, which approval would not be

required in a bankruptcy case.  Despite this significant level of interest from third parties, the Board never considered the possibility of a § 363 sale once it did file bankruptcy.  Instead, Gidumal, as explained below, exercised dominion and control over RoomStore and prevented any such process from being considered, resulting in significant harm to RoomStore's bankruptcy estate.

47.     By July 2011, Wells Fargo had become so concerned with the Company's path that it caused RoomStore to retain FTI Consulting, Inc. ("FTI") to review the Company's books and records.  FTI began work in August 2011, and promptly reported to the Board at an August 10th Special Meeting of the Board of Directors that "absent a liquidity event such as a transaction with a strategic buyer or a sale of Mattress Discounters, FTI expected future operations to be difficult."

48.     At or about this time, Gidumal introduced a new path for RoomStore. Instead of a sale transaction that would serve to eliminate his equity interests in RoomStore, Gidumal brought in Ducon Technologies ("Ducon"), a company with no prior experience in the furniture industry, as a potential investor in the Company. Gidumal reported to the Board that Ducon was looking to invest $2 million and provide a $1 million loan to the Company in exchange for 60% equity and control of the Board. For this offer to be viable, however, the Board acknowledged that it likely would need to be part of a larger capital raising campaign since a $3 million infusion from Ducon would be insufficient to turn RoomStore around.  Gidumal, apparently seeing an opportunity for personal gain in a restructured RoomStore, proposed that current

18

investors be allowed to invest alongside of Ducon and obtain 15% equity interest for each $1 million invested.

49.     Ducon later revised its offer to purchase RoomStore, exclusive of MDG, for $1.00.  The Board decided to pursue this offer, with Gidumal taking the lead.  Upon information and belief, Gidumal also brought the Grossman Group, one of the Company's largest existing shareholders, into the mix with a proposal to invest capital in the Company in the form of a loan that would be converted into equity.  The full Board considered this offer to be unacceptable.

50.     As for MDG, Mr. Bojanowski presented the Board with an offer to purchase an additional stake in MDG, but the Board felt this offer did not provide sufficient value to "shareholders."  Sleepy's also negotiated with the Board for the purchase of MDG, got close to finalizing a transaction, but declined to move forward because of a dispute involving the structure of the proposed transaction.

51.     Ultimately, discussions regarding a sale of the entire Company ceased. By the end of October 2011, the Board finally solicited the advice of a bankruptcy attorney regarding possible bankruptcy options for the Company.  That attorney, who later became counsel for the Debtor, advised that RoomStore should have a plan and disclosure statement prepared at the time of filing for bankruptcy. As discussed below, Gidumal wrongfully controlled the plan of reorganization process and wholly failed to timely develop a feasible plan by the deadline required by RoomStore's lender. Moreover, Gidumal breached his duty of loyalty by controlling the process to the detriment of the Debtor's estate in hopes of achieving personal gain.

### Gidumal Takes Control over the Board of Directors

52.     As averred previously, Gidumal joined the Board in April 2011, filling a vacancy created by a director who resigned in March 2011.  The other directors in office at the time Gidumal joined the Board were:   Robert Shaffner, the then-Chairman, Ronald Kaplan, N. Martin Stringer, and the then-President and CEO of RoomStore, Curtis Kimbrell.

53.     Following Gidumal's arrival, the five directors required by the bylaws of RoomStore dwindled.  In May 2011, Mr. Stringer resigned.  On November 5, 2011, Mr. Kimbrell was terminated as President and CEO, and thus resigned his office as a director.  On November 22, 2011, the Board's then-Chairman, Mr. Shaffner, resigned. The Board of a required five directors was reduced to just two directors,  Gidumal and Mr. Kaplan, with Stephen Giordano replacing Mr. Kimbrell as the CEO and a Board member.  Upon Mr. Shaffner's resignation, Gidumal became Chairman of the Board on December 3, 2011, and thereafter, seized control of the Company.

54.     At the time that RoomStore filed bankruptcy, it had only three directors: Gidumal, Mr. Kaplan, and Mr. Giordano.  Mr. Giordano had no experience with financial or operational turnarounds and had never been a director of a public company.  After the bankruptcy filing, Scott Williams joined the Board on January 9, 2012, as a representative of certain shareholders of RoomStore, but the fifth Board member spot was never filled despite the bylaws stating that "[t]he number of Directors constituting the Board of Directors shall be five."  The General Counsel of RoomStore who recorded Board meetings never met Mr. Williams.

55.    The Board of Directors also established a Corporate Governance Committee, which was responsible for assisting the Board by overseeing the performance and composition of the Board to ensure effective governance.   The members of the Corporate Governance Committee at the relevant times were Gidumal and Mr. Kaplan.   Upon information and belief, the Corporate Governance Committee never met in 2011 or 2012 despite the serious governance issues facing the Board.   No minutes of any meetings of the Corporate Governance Committee in 2011 and 2012 are included in the Company's records.   One critical function of the Corporate Governance Committee, which did not occur, was the review of the need for an independent or special committee of the Board to handle strategic transactions assessments and negotiations where a director, in this case Gidumal, had a conflict of interest.

**The Bankruptcy Filing**

56.    Within days of Gidumal becoming the Chairman, in light of the longstanding downward slide in operations and finances, RoomStore filed a voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court").   The filing occurred on December 12, 2011 (the "Petition Date").   On July 24, 2012, the Bankruptcy Court entered an order converting the Debtor's case to one under chapter 7 of the Bankruptcy Code.   The Company then terminated its employees, was unable to honor customer orders or return customer deposits for orders, and was liquidated.   It is the willful and reckless misconduct of Gidumal that occurred between the Petition Date and conversion that gives rise to this Complaint.   Specifically, Gidumal's breach of the

fiduciary duties of care, good faith, and loyalty that he owed to RoomStore as a corporate director of RoomStore, and the separate breach of his fiduciary duty as a director of a debtor-in-possession to maximize the value of the Debtor's estate form the core of this lawsuit.

### Gidumal's Uninformed and Reckless Decision-making

57.     Gidumal was improperly controlling in his leadership.  During a time when RoomStore required a board chairman who would bring constituents together to determine how best to maximize value for all stakeholders, and use bankruptcy and reorganization professionals to assess the proper course for the Debtor, Gidumal did the exact opposite.

58.     Consistent with his unmitigated desire to control the critical decision-making at RoomStore, Gidumal usurped for himself all strategic decisions affecting RoomStore.   Among other things, he imposed his will on Company management, excluded advisors from critical reorganization efforts, intentionally blocked any assessment of maximizing value through a going concern process, misrepresented facts to management and key stakeholders, failed to inform himself of material information required to make informed and reasoned business decisions, took from the full Board the opportunity to make decisions that he made on his own outside of formal Board meetings, failed to disclose to the full Board at a meeting his intention to purchase equity through a plan of reorganization process that he closely guarded, failed to follow through on vital projects that he retained sole control of, hindered and impeded efforts to effect any transaction that would not inure to his benefit, consciously disregarded his

fiduciary duties as a corporate director and as a director of a debtor-in-possession under the Bankruptcy Code, and put his own personal interests ahead of RoomStore and its bankruptcy estate.  By such willful misconduct, Gidumal assumed the risk that his actions and omissions would harm RoomStore and its bankruptcy estate, which acts and omissions would not be subject to any business judgment rule or other protections in light of the manner in which he ruled and controlled RoomStore.

59.     Upon the filing of bankruptcy, the Debtor and its Board members were charged with fiduciary duties to maximize the value of the bankruptcy estate.  These duties supplement the duties of care, loyalty, and good faith that Gidumal owed to RoomStore prior to the bankruptcy filing and continued to owe throughout his tenure on the Board.

60.     Gidumal and the Creditors Committee appointed in the bankruptcy case knew that in order to successfully emerge from bankruptcy, the Bankruptcy Court's approval of a plan of reorganization was required; however, they also knew that the Debtor required a capital infusion and a new credit facility, or "exit financing." Otherwise, to preserve value, the Company and/or its assets needed to be timely marketed for sale prior to the point at which the Company would be left to engage in a "fire sale."  Thus, any effort to turnaround RoomStore in the face of the national economy, the housing market, RoomStore's decreasing furniture sales and other financial results, projections, and lack of inventory was extremely risky and required in-depth analysis, information, diligence, and negotiation with the Committee and RoomStore's lender.

61.     In the face of these significant obstacles to a turnaround, the Chairman chose not to call a Board meeting to discuss a path for RoomStore in its bankruptcy case until January 17, more than a month after the filing.  At that January 2012 meeting, there was no discussion about the value of RoomStore, the strategic alternatives available to RoomStore, or a proposed structure for RoomStore's exit from bankruptcy.  There was, instead, a discussion of Board member compensation.

62.     By that time, Gidumal was well aware that RoomStore's financial performance was well below comparable year results and that the Debtor was not meeting its projections.  He was also fully aware that "the working capital position, losses from operations and commencement of the Chapter 11 [c]ase [had] raised substantial doubt about the Company's ability to continue as a going concern."

63.     Gidumal also knew that either selling the Company or engaging in an orderly liquidation to provide value to creditors would result in a loss of his existing equity and the opportunity for future personal gain through new equity in either RoomStore or MDG.  It was not lost on Gidumal that as time passed and his misconduct and personal interests came to light, he faced the risk of liability for his misconduct without a plan of reorganization in which he could attempt to secure a personal release.  Thus, Gidumal's focus was not on an orderly liquidation of the company but rather on getting more money to spend on operations.

### Gidumal Negates the Debtor's Agreement to Provide a Dual-Path Timeline to Maximize the Value of the Debtor's Estate

64.     While the Debtor initially obtained post-petition financing (the "DIP Loan") from Wells Fargo, that lender subsequently assigned all of its interests and obligations in the DIP Loan to a replacement lender, Salus Capital Partners, LLC ("Salus").  The new DIP Loan modified the terms of the prior DIP Loan to increase borrowing capacity for RoomStore.

65.     In connection with the replacement DIP Loan, the Committee was concerned about the maximization of value because of the increasing claims and the resulting diminution in value of the bankruptcy estate, and the additional borrowing obtained under the DIP Loan that would be used to fund ongoing operating losses. Because the Debtor had not analyzed or identified any assessment of the manner in which it planned to maximize the value of the Debtor's estate, the Committee conditioned its support of the assignment of the DIP Loan on an express condition that the Debtor agree in writing (the "Agreement"), which it did on January 20, 2012, that it would provide the Committee with an outline and timeline for a going concern sale process "that would be ready to put in place in advance of a GOB sale process if the financial performance of the debtor does not improve."  The timeline and outline for a going concern sale process was to be received by the Committee by February 1, 2012.

66.     Gidumal was a direct recipient of RoomStore's written agreement to engage in such a process.  This promise by the Debtor, however, proved to be illusory and provided for the purpose of gaining the Committee's approval for the Debtor's

additional borrowing. Notwithstanding the various obligations of a debtor-in-possession and its Board members, and the specific obligations of the Debtor as set forth in the Agreement, Gidumal instructed an advisor of RoomStore that nothing further needed to be done regarding assessment of a sale process.

67.     In connection with the Agreement between the Committee and Debtor, a meeting was scheduled for February 1, 2012 between Mr. Giordano, FTI, and Alvarez & Marsal ("A&M"), the Committee's financial advisor, to discuss the business plan for the Debtor, its recent performance, and the way to maximize value for the benefit of the creditors of RoomStore, including the going concern sale outline and timeline.

68.     In advance of that meeting, RoomStore's general counsel acknowledged the obligations of the Debtor and its Board to maximize value by advising Mr. Giordano that in anticipation of the Debtor giving a presentation to the Committee, the Company would "[n]eed to explain the expected liquidation value of the company, versus what they should expect to recover from a reorganized RoomStore, and make the case for why the delta is worth the added risk of allowing RoomStore to use cash to reorganize." He further explained, with respect to RoomStore's interest in MDG, that management would "[n]eed to explain the current value of MDG, why this value would be impaired if a sale is forced through the bankruptcy proceedings, and why we believe the best course is to hold on to the asset and grow MDG."

69.     Notwithstanding the necessity of such an analysis, an assessment of comparative value and risk was never performed or evaluated by RoomStore's Board because Gidumal refused to engage the full Board and the Company's advisors in such

an effort.  Rather, he specifically informed a Committee advisor that he had no intention of entertaining any process to sell MDG or RoomStore.  Instead, he decided that his notion of a turnaround was the best approach, so that he could protect his existing equity holdings and position himself for the purchase of additional ownership equity by being a plan sponsor.  In making that unilateral determination, Gidumal never sought or obtained any analysis or assessment of whether his willingness to gamble with himself at the helm of a restructured RoomStore was fair or even feasible for the Debtor and its bankruptcy estate, and such decision was never made at a Board meeting.

70.    Consistent with the Committee's requirement as expressly set forth in the Agreement and the advice of RoomStore's general counsel, FTI's lead advisor for RoomStore advised Gidumal that the Company should begin a dual track process to explore a going concern sale process while attempting the turnaround.  FTI's advice and services in that regard were rebuffed by Gidumal.

71.    Indeed, at the February 1 meeting, RoomStore's representatives did not provide the required timeline and outline of a going concern sale process.  The presentation by FTI included only a forced liquidation analysis that showed a recovery to creditors of up to fifteen cents per dollar.  FTI also acknowledged that under the proposed turnaround plan, the Company would need $5 to $8 million in capital to exit bankruptcy and continue on a go-forward basis, if it was able to achieve the sales and operational assumptions set forth in the presentation.

72.    At the conclusion of the meeting, FTI, as RoomStore's financial advisor, and A&M, as the Committee's financial advisor, both still believed that planning and commencing a dual track process was not only consistent with the Debtor's promise to the Committee, but necessary for the Debtor to comply with its fiduciary obligations. As a result, there was an agreement that Mr. Giordano should present the issue to the Board so that the Board, which had not done so as of that date, could gather information, consider and assess such information, and make a reasoned and informed decision regarding the appropriate path to maximize value for all of RoomStore's stakeholders, which evaluation would include a comparative assessment of an orderly liquidation process, going concern sales, a capital raise, and reorganization.

73.    As previously alleged, there was no post-filing Board meeting in December 2011, there was only one Board meeting on January 17, 2012, at which there was no discussion or presentation on the maximization of value or potential liquidation or sale valuations or assessments, and no Board meeting in February, even though the Debtor's value remained a "melting ice cube."  Prior to bankruptcy and before Gidumal took the helm as Chairman, the Board had been meeting as many as six times a month.

74.    In the immediate aftermath of the February 1, 2012 meeting, the Committee, A&M, FTI, Mr. Giordano, Debtor's counsel, and other senior management of RoomStore tried to convince Gidumal to call a Board meeting.  At that time, there was no clear path that the Company was pursuing, there had been no formal Board decision with respect to strategic alternatives for RoomStore, and Mr. Giordano and others were concerned that Gidumal was making major decisions on his own such that

the full Board did not have all of the facts regarding the Company's deteriorating

performance and future path.

### Gidumal's Willful and Reckless Misconduct Prevented the Exercise of Proper Corporate Governance

75.     It was common knowledge that the Board and management were

dominated by the heavy hand of Gidumal.  Gidumal's behavior led to the Board's

conduct being described as "dysfunctional" by a senior officer, and Gidumal's conduct,

in particular, was described as "destructive," thereby requiring time and effort by

management to repair relationships after Gidumal's involvement.

76.     To maintain control of the process and further his personal interests, the

Chairman chose to feed only selective information to the Debtor's bankruptcy

professionals.  The Debtor's bankruptcy professionals routinely were unable to provide

critical information or answer key questions of Salus or the Committee because the

information and answers rested solely with Gidumal.  Moreover, even though they

were restructuring experts and had significant experience in the retail and furniture

markets, and were hired by the Board for those purposes, Gidumal never once asked

FTI to provide any advice or valuations.

77.     Further, Gidumal compartmentalized the roles undertaken by members of

senior management.  For example, the Chairman relieved the Debtor's CEO of any

involvement with exploring equity raising or negotiating the sale of assets, and

restricted or attempted to restrict him, a fellow Board member, from contact with the

Committee, Salus, the Debtor's real estate professional, and the minority shareholder of

MDG.  Gidumal viewed Giordano's efforts as "butting in" on the Chairman's control of day to day management of the financial affairs of RoomStore.  Gidumal went as far as stating in writing that: "When Giordano butts in on this as inevitably he will do, please tell him to deal through me. Steve [Giordano] has been stripped of all negotiating authority on the leases and on Dallas."

78.    In the face of Gidumal's unilateral decision-making and domination over the Board and the bankruptcy process, Mr. Giordano reminded the Chairman that "as CEO it is my view that I must play a critical role in the success of efforts to obtain new debt or equity along with Board members.  My job is not [chief operating officer].  My job is CEO.  I have held both and I know the difference."  Mr. Giordano further declared that: "[FTI] is the point person on the company's restructuring and [FTI] reports to me. Of course, I report to the Board.  When an [investment banker] is retained, it will be in charge of the investment banking process.  Not you and not me.  The [investment banker] will report to me and I will report to the Board."  The CEO further stated that "You hired me as the CEO and that means that I must be active in all aspects of the business, not solely operations but the restructuring too."

79.    Gidumal responded to the CEO's instruction by stating that he "profoundly disagreed" with the CEO and further that "[FTI] has NEVER been asked or appointed to be the point person for the restructuring.  Never, ever.  I was never told to report to you on anything to do with the restructuring."   Apparently displeased with the CEO's perceived attempts to "butt in" on his control over the Debtor, at the next Board meeting, Gidumal excused Mr. Giordano from the meeting and convinced the

remaining Board members to adopt his view limiting the CEO's involvement in RoomStore's restructuring efforts.  Recognizing the dysfunction created by Gidumal's unilateral usurpation of RoomStore's affairs and the harm it was having on the direction of the Debtor, Debtor's counsel forwarded the email dispute between Giordano and Gidumal to a major shareholder and commented: "The more these guys argue, the less odds of a successful reorganization. . . . Please don't forward or share this email."

80.    Debtor's counsel also warned that "the creditors committee fully expects that FTI is advising you on the restructuring.  The committee will be shocked if we tell them anything different."  The truth, however, was that Gidumal had excluded FTI from advising on the restructuring and had no interest in obtaining FTI's input. Gidumal's unilateral conduct manifested itself by his ignoring of advice that in any way contrasted with his personal views.  In this regard, Gidumal rebuked those who dared to disagree with him by proclaiming such views as "just an example of the stupid decisions that happen when people inexperienced with what businesses can be worth are pushing for action (A&M and FTI and the [Committee] in our case)." Gidumal's corrosive attitude led to the Debtor's professionals commiserating with one another: "Clearly, he's just head and shoulders smarter than the rest of the world;" "Steve Gidumal doesn't acknowledge how he has demoralized people"; "I hope you started a file for these exchanges";  and "Whatever you say, Steve.  Your call."

81.    This complete and ongoing dysfunction and disconnect led counsel for the Committee to express to Debtor's counsel "the frustration of the Committee with the

lack of progress of the Debtor in exploring and preparing to execute alternative strategies for exiting from bankruptcy.  The refusal of the Board to meet promptly and address alternative strategies puts the creditors of the estate in a precarious position." The Committee counsel continued: "We were very disappointed to learn that this meeting has not taken place and may not be held until sometime next week at the earliest, which delay jeopardizes the ability to move to a going concern sale strategy. . . . As I know you are aware, a debtor-in-possession has the fiduciary duty to protect and maximize the assets of the estate.  The Committee views the consideration of a sale of the Debtor's assets as a going concern, including the remaining Texas assets, as an obligation of the Debtor's management under the Bankruptcy Code."

82.    Despite this clear message to the Debtor, no action to comply with the Board's fiduciary duty to maximize value by evaluating strategic alternatives was taken.  In fact, almost a month later, in response to Gidumal's inquiry as to why the Committee was requesting documents from the Debtor, Gidumal received an email from the Committee's advisor explaining that "[t]here seems to be an extreme disconnect between the debtor's Board and its advisors and management on this case." The warning continued:

> By your own advisors' calculations, it is probable that the company may be running out of cash as early as April 1, 2012 and the debtor and the board do not appear to be developing any solutions to this potential liquidity crisis. . . .  We are concerned there is no leadership by the board. Specifically, it is our understanding that the Board has refused to meet since the beginning of the case until Tuesday of this week.  We are not aware of the result of that Board meeting, but if the result was anything other than an agreement to pursue a dual track process for a going concern sale while the Debtor continues to review its reorganization

options, then the Committee believes the Debtor is not meeting its fiduciary obligations to creditors. . . . [I]f the Board do[es] not move forward with exploring all options that will best preserve value for the benefit of the estate, then we may have litigation.

83.    Gidumal's controlling behavior and disregard for his duties as a Board member of RoomStore are further exemplified in connection with the request and directive of the advisors, management, and counsel to hold a Board meeting in February 2012.  On February 6, Mr. Giordano inquired of Gidumal about holding a Board meeting as recommended by FTI, the Committee, and Lowenstein, to which the Chairman unilaterally decided: "We are not having a Board meeting either this week or next.  It's premature."  The next day, on February 7, 2012, after having received requests from Mr. Giordano, the Debtor's counsel, the Committee, and FTI for the scheduling of a Board meeting, the Chairman rejected the requests and summarily pronounced that such a meeting was "premature."  FTI warned him that if a banker does not start working for another four to six weeks, RoomStore would never have a chance to raise capital before the company ran out of liquidity.  The Chairman ignored this plea, and unfortunately, FTI's warning came to fruition.

84.    A&M also directly requested that the Chairman call a Board meeting during this time period.  In response, the Chairman rejected the need for such a meeting and represented to A&M that "[t]he Board is interviewing investment bankers to raise . . . capital."  That statement, however, was false.  The Board was not involved at that time with potential investment bankers in an "interview" process.  A&M forwarded the Chairman's response to FTI, which in turn forwarded the response to

Debtor's counsel with the comment, "You wonder why we have problems."  What Gidumal did not reveal to A&M was that he had been in contact with several large shareholders of RoomStore and they wanted to pursue an attempted turnaround. Presumably, Gidumal did not share that information with A&M because it was clear evidence of his motive and allegiance to the shareholders' interests and not the creditors.

85.     Because the Chairman did not call a Board meeting as requested by the various constituencies, and further because the Company continued to miss projections, A&M reminded the Chairman of his fiduciary obligations as a Board member of a debtor-in-possession under the Bankruptcy Code and the likely damages occurring from the unnecessary and inappropriate delay by the Board in assessing the proper strategic path for the Debtor:

> I reviewed cashflows today. We are obviously concerned that the projections made by management continued to be missed; even the 'weekly updated' ones.  As we discussed with management and FTI on February 1, 2012, and several times since then, including Monday, we think it is very important to be gearing up for a strategic sale process of the various assets to ensure value is maximized while the Debtor is evaluating plan options.  FTI told me Monday, that they have started working on putting together a book to market the company this week but I think we should strongly consider 'putting on the gas' to speed up the process and get into the market to raise funds and/or run a strategic sale process.  At this current rate, the debtor seems to be potentially placing this debtor into a deepening insolvency situation with your continued operating burn of cash.  Let me know if there is anything we can do to help move the process alon[g].  We all want to ensure value maximization.

86.     While Gidumal was forced to acknowledge the "painful" financial results of the Company during this time period, he nevertheless accused A&M and the

creditors of attempting to "micromanage" the Debtor, declared that any progress by FTI with respect to a sale process was "without Board approval," and reiterated his unjustified position that delay was good for the Debtor.  Incredibly, in the face of the disastrous financial results, the ongoing inventory crisis and the oppressive monthly cash burn, the Chairman vexingly suggested that the Committee should "[j]ust strap yourself to the mast and ride out the storm with us . . . ."

87.     Not only was A&M concerned about maximizing value for the creditors, FTI shared the appropriate view that the "collective obligation is to maximize the value of the Estate" and its recommendations to the Board were reflective of a goal that "protects and enhances value for all of the assets and stakeholders." While FTI acknowledged that in a vacuum, more time would be beneficial to show performance improvement, if any, the circumstances that RoomStore found itself in did not allow for the delay that Gidumal was imposing on the process.  FTI stated: "[O]ur own cash flows indicate that we are going to have a liquidity shortfall in coming weeks.  Given our current trajectory and actions, the Committee believes the Company is headed for certain liquidation. . . . .  We need a viable contingency plan to fund the business."

88.     Given the blockade that Gidumal had created on decision-making by the Board, FTI shared with Mr. Giordano the need "to be as forceful as possible with the Board given the current circumstances."  FTI believed that the lack of response from the full Board was problematic.

89.     Notwithstanding the repeated requests for a Board meeting in February, more than a month passed and the Chairman still had not called a Board meeting or

completed any assessment of valuations or strategic alternatives for the Board's consideration in determining whether the turnaround path Gidumal was championing would maximize value or continue to destroy value as the financial indicators made clear.

90.    Because Gidumal had blocked the Board meeting to address these issues, Mr. Giordano took the remarkable step of contacting RoomStore's general counsel to discuss the procedure and process for someone other than the Chairman calling a Board meeting.  Subsequently, Mr. Giordano emailed Gidumal telling him that he "would like to call a board meeting" to discuss certain topics, including "cash flow sensitivity, threats and opportunities," "activities of the creditors committee," "operational performance," "the company's desire to exit [bankruptcy] later rather than sooner and the strategies necessary to accommodate that desire," and special payments to certain board members.

91.    Predictably, Gidumal did not take kindly to Mr. Giordano's attempt to set an agenda and call a board meeting.  Even though Mr. Giordano served not only as CEO but also as a member of the Board, Gidumal admonished him by proclaiming: "You needn't set the agenda; it's unusual for the [sic] person other than the Chairman to set the agenda.  I'll tell you what the Board needs to hear from you."  Gidumal seemingly forgot that Mr. Giordano was himself a Board member, or decided to marginalize him to maintain control over the process.

92.     Immediately thereafter, Mr. Giordano sought counsel from Debtor's counsel and admitted that he was "concerned about the business" and he believed "that our board must know the facts."

### Gidumal's Reckless and Unjustified Gamble with the Estate's Assets

93.     Despite knowing the Debtor's fragile condition, and with further knowledge that RoomStore had suffered substantial operating losses and significantly missed its projections for operations, Gidumal nevertheless forced the failed turnaround effort to continue as RoomStore's value waned.  Gidumal knew at least as early as February 1, 2012 that his plan to provide a return to equity and capture a future personal interest in a reorganized RoomStore all depended on sales results.

94.     Gidumal repeatedly pronounced the view that before he could secure exit financing, a buyer for the Company, or new capital, RoomStore had to demonstrate several months of improved performance.  The Debtor, however, had suffered an extraordinary operational cash burn since the Petition Date.  The Debtor missed its forecasted sales nearly 80% of the time and typically by between 20% and 55% to the downside.  Moreover, the Board never had or discussed any "data points" about the economy changing to RoomStore's benefit.  Even the Chairman, who had taken it upon himself to handle capital raising, knew that a cash infusion before June would be impossible.  To further his planned reorganization approach, however, Gidumal misrepresented to management that he had, in fact, secured exit financing for RoomStore in February.

95.     RoomStore's projections generated during the bankruptcy were missed for several reasons, including that the Company had insufficient cash or vendor terms to purchase adequate inventory, there were insufficient funds to purchase advertising due to resources being allocated to other operational expenses, and the projections were inaccurately optimistic.  In one exchange between Mr. Giordano and Gidumal in late February, Mr. Giordano questioned Gidumal's directive that he include $750,000 in the projected cash flow for April relating to the sale of real estate that had not even been marketed yet.

96.     In February, when, as explained above, numerous people implored the Chairman to hold a Board meeting so the Board could be informed and could consider in an appropriate fashion the proper course for RoomStore, including consideration of a dual track process, Gidumal abruptly responded by suggesting that nothing matters until late February when RoomStore could assess its President's Day sales results. This hope for RoomStore's salvation occurred without any analysis of the ability to meet customer orders with inventory, the ability to cover the cost of ongoing operations, and meaningful projections regarding RoomStore's financial picture in March, April, and beyond.

97.     As several members of management recognized, a lot was riding on President's Day.  As could have been anticipated, the results from President's Day were not the answer to RoomStore's ongoing operational and financial struggles. Indeed, as made clear at a March 7 Board meeting, the first meeting since mid-January, "sales results were under plan."  One key reason given for the under plan results was

the lack of inventory, a fact which was known or should have been known by Gidumal in February when he was using President's Day as a reason for the turnaround efforts to limp along. In fact, the Company's ability to operate had been decimated by the prior month cash burn and losses. RoomStore's inventory had sunk to $13 million, when a "reasonable inventory level for the Company is $20 million." This lack of inventory led to an astonishing 24% sales order cancellation rate by customers.

98.     Mr. Giordano explained that RoomStore was using cash at the rate of $2 million per month and would "soon run out of cash." Because Mr. Giordano and FTI's representative determined that they needed to be as forceful as possible with the Board, particularly Gidumal, FTI presented its view of the finances as well. This was the first and only time the Debtor's financial advisor appeared at a Board meeting. FTI confirmed that "[t]he Company was rapidly running out of cash . . . [and] [a]s a result, key stakeholders in the bankruptcy are very concerned." Without additional liquidity, FTI advised that "a liquidation of the Company would begin in April," the following month. FTI also informed the Board that RoomStore was in default under the terms of the DIP Loan. While the circumstances as of March 2012 were dire, they soon declined even further.

99.     In April, sales were down from the prior year for comparable stores and over 48% on a cumulative basis. The comparable store sales figures were telling in that 2011 was a very poor year for RoomStore and in post-filing it was not even coming close to matching its weak 2011 results. Sales for the week leading into

April 2012 were down 57% on a comparable basis versus Gidumal's projection of sales being down only 29%. Globally, since the filing of bankruptcy, the Debtor missed its budgets by a cumulative 23% and sales projections were ratcheted back two times. From the beginning of the bankruptcy case through the end of March, the operational cash burn of the Company was more than $7 million, and as described above, it was cannibalizing its own estate assets to support the ongoing losses. The Debtor's own projections, even with this liquidation of assets to create available cash included, nevertheless reflected a continuing cash burn. So, if history was any example, missing future projections would create even more of a cash burn. Notwithstanding this downward trajectory, the liquidation analysis performed in January for the February 1, 2012 meeting was never updated so that Gidumal or the Board could determine whether the turnaround path was value maximizing.

100. As of this time, the Debtor's advisors had informed Gidumal that RoomStore may need as much as $5 to $8 million to emerge from bankruptcy. Of import, however, Gidumal had not materially advanced any capital raising process known to FTI, over which FTI understood Gidumal was in control. FTI was also unaware of the hiring of any investment banker to either raise capital or begin a sale process.

101. By April 17, 2012, a mere two weeks after the Debtor fought to extend the time for it to file a plan of reorganization, Mr. Giordano informed Gidumal and the Board that the Debtor was unable to purchase additional inventory because of continued misses in projections and fees RoomStore had to pay to Salus

to buy time.   He explained that the available warehouse inventory had been reduced to just $2.7 million at the main distribution center and that the Company had entered into a "cyclical process" whereby growing back-orders of merchandise meant that even "if we do well in sales, we will hit the demand of $7M per month . . . and be in a worse position in June."  As inventory was sold, because the Company was unable to replenish it, the borrowing availability under the DIP Loan dropped.  To compound the problem, Mr. Giordano explained that the Company did not have money to buy advertising for the upcoming months.

102.   In other words, by April 2012, the Board knew that the Debtor's death spiral that had begun months earlier had markedly progressed.  Incredibly, Mr. Giordano made reference to the fact that at least one of the Board members had "always maintained [this] would happen."  Gidumal knew or should have known that it would happen, but he nevertheless imposed his will on RoomStore without any consideration of alternative approaches. He nevertheless caused operations to run to the point of absolute illiquidity, despite knowing by April 2012 that even hitting unachieved sales targets would lead to continued deterioration of liquidity.

**Gidumal Cannibalizes the Debtor's Assets to Support his Doomed Vision**

103.   In supporting ongoing losses from operations resulting from his failed turnaround concept, Gidumal cannibalized and wasted RoomStore's asset value that could have been preserved.

104.   The Company had already wasted the proceeds from a January liquidation of merchandise from eighteen of the Company's furniture retail stores and

41

sale of merchandise in an additional seven stores.  In the spring of 2012, auctions of ten stores in Texas took place, with RoomStore's proceeds also being wasted in operations. In addition, it had wasted a substantial cash dividend it had received from MDG. Further, the inventory of the Company continued to be depleted.  This, however, was not enough to put an end to Gidumal's reckless path for RoomStore.

105.    Despite stretching its finances, including objecting to bankruptcy professional fee applications to delay payment, failing to pay post-petition vendors, taking and failing to return customer deposits (in direct contravention to RoomStore's counsel's advice), using funds provided by Salus under the budget for rent and sales taxes to pay other expenses (in direct contravention to RoomStore's counsel's advice), and wasting away valuable assets to support continued losses, the Debtor finally succumbed.  On June 7, 2012, with essentially all liquidity wasted, the Debtor filed a motion to approve the auction of its remaining retail store assets.

106.    Even in the midst of the failure of Gidumal's forced turnaround plan, his allegiance to shareholder interests and disregard of the creditors' interests stayed true as the estate's value declined.  In addition to breaching the Agreement to begin a dual track sale process for RoomStore and MDG, Gidumal also caused the breach of an agreement to begin a process for the marketing of the Debtor's interest in MDG. Pursuant to a Fifth Amendment Stipulation filed on May 7, 2012, which the Committee demanded be embodied in a Bankruptcy Court order as a result of the Debtor's breach of the Agreement, the Debtor executed a retention agreement with an investment banker to implement a marketing process for the Debtor's interest in MDG

as soon as possible.  Rather than jointly seek an investment banker candidate with the

Committee, or ask for a list of candidates acceptable to the Committee, the Chairman,

as had become customary, found his own candidate that neither the Committee, Salus

nor Mr. Bojanowski found acceptable.

107.    The Committee, Salus, and Mr. Bojanowski objected to the proposed

retention of Gidumal's selected banker because of doubts concerning the process

employed by the Chairman in selecting the banker, and in the banker's experience in

the relevant industry.  Gidumal decided to hire the proposed banker because "[w]hen

asked to provide their estimates of proper valuation multiples for MDG, [three of the

four alternatives] gave estimates below segment norms and well below the Board's

internal valuation estimates, and [the fourth alternative] did not directly respond."  In

other words, the Chairman dismissed the alternative investment banker candidates

because they disagreed with his unrealistic valuation of MDG, instead providing

suggestions of value that would not realize a return for equity.  Only on the day of the

hearing, facing objections from each major creditor constituency, did the Chairman

relent, but not before he had caused more damage to RoomStore.

### The Plan of Reorganization Process was Closely Guarded to Further Gidumal's Personal Interests

108.    Further evidence of Gidumal's willful, destructive and debilitating control

over RoomStore arose in connection with the critical plan of reorganization process.  By

all accounts, RoomStore would only survive if a feasible plan of reorganization could be

confirmed by the Bankruptcy Court.  Further, as an express term of the DIP Loan with

Salus, a plan was required to be filed by April 15, which was later extended 60 days.

109.    As late as April 12, just three days before the then-existing deadline,

Debtor's counsel emailed the Chairman informing him that Debtor's counsel had "no

idea what will be the reorganized capital structure, exit financing, payment to

unsecured creditors, etc."  Counsel reminded Gidumal that they were "following [his]

directive that the [plan of reorganization] is [his] project."  With respect to counsel's

lack of knowledge about the proposed dividend, amount of exit financing, and amount

of fresh equity, counsel reiterated that FTI, Mr. Giordano and others made clear "that

you are the only one who is authorized to answer these questions, so we need to hear

from you."

110.    Instead of providing the required information that was under his

exclusive control, Gidumal responded by asserting baseless accusations against FTI of

"professional negligence", and against Debtor's counsel in purportedly attempting to

"sabotage RoomStore's emergence" and "engag[ing] in misinformation, false

accusations, and panicked counsel."

111.    Not long after, Gidumal's motive for taking sole control of the plan of

reorganization process became clear.  The Debtor's proposed plan of reorganization and

disclosure statement confirmed what the Committee had long suspected—that Gidumal

had adopted a "risk it all strategy" for an unachievable distribution to the holders of

equity security interests, including the hedge fund he ran.  Even more revealing, and

equally disloyal, a plan summary document revealed that Gidumal intended to be a

plan sponsor and purchase a substantial percentage of the Company through the plan process, which would allow him to gain control of MDG, an asset of the Debtor that Gidumal believed had significant value, and that he refused to sell at all costs.

112.   The Plan Summary revealed that if an unstated certain performance level was achieved, current shareholders, including Gidumal's fund, could receive a return on their investment.  This protection of his ownership interests is consistent with his communications with other shareholders during the case about proceeding with the turnaround effort.

113.   The Plan Summary also made clear that the Chairman had a personal agenda for the future of RoomStore, which included purchasing significant ownership interests in reorganized RoomStore through his fund.  For a $5 million to $9 million equity investment, which would potentially include his fund, such investors would obtain between 40% and 75% of the equity in reorganized RoomStore.

114.   This personal interest placed the Chairman on both sides of the proposed transaction for RoomStore, incentivized him to avoid any liquidation or sale of the Company, including MDG, and created an inherent and insoluble conflict of interest. Mr. Giordano, as early as February 24, reminded the Chairman that if he intended to invest in a restructured RoomStore, he should "not be involved directly in negotiations with the creditors committee."  This advice was summarily rejected.

115.   Notwithstanding this clear conflict that made the Chairman an interested director, no independent or special committee of the Board was created and, instead,

45

the Chairman continued to exert control, dominance, and influence over the path of RoomStore and the day to day decision-making for the Company.

116.    In addition to his whimsical hope for a return on his fund's current RoomStore investment, Gidumal also wanted to create personal gain through a personal stake in MDG, whether directly or indirectly through RoomStore's ownership of MDG.  His plan all along was to carefully control, manage, and reap a windfall from the long-term sale of MDG.  This goal, and Gidumal's disregarding of conflicts, was evidenced when he approached the minority owner of MDG after the bankruptcy was filed, and at a time when he was on both the MDG and RoomStore boards of directors, with an undisclosed offer for him personally to buy the minority shareholder's equity in MDG.  This offer was only revealed to the RoomStore Board when the minority shareholder of MDG, Mr. Bojanowski, submitted a declaration in Bankruptcy Court stating as such.

117.    Gidumal's pursuit of gaining additional ownership of RoomStore and MDG was based on his personal belief that MDG was worth $23 million on or about April 10, 2012, and up to $80 million by the end of the then-current fiscal year, with growth potential in EBITDA that would generate a value of $120 million.

118.    Indeed, even though the Chairman owed fiduciary duties directly to RoomStore and the bankruptcy estate, he testified under oath that he would allow the complete liquidation of RoomStore, but hold on to RoomStore's 65% interest in MDG. The Debtor's advisor became aware of Gidumal's position with respect to MDG and

commented that while "Gidumal feels strongly about this, [the advisor's] focus is having a survival path for RoomStore."

119.    Gidumal recognized the inherent conflict that existed with his efforts to obtain additional equity in RoomStore by expressly referencing that the proposed transaction would give rise to such conflict in the Plan Summary document. Despite his awareness of the conflict, Gidumal chose not to abstain from decisions involving the turnaround efforts or disclose such conflict to other constituents in the bankruptcy case, and instead deleted any reference to his participation in the proposed new equity investment in a term sheet provided to Salus, RoomStore's lender.

120.    The plan of reorganization also revealed Gidumal's loyalty to himself and others, and not RoomStore. The extended deadline for the exclusive filing period for the Debtor to file a plan of reorganization was June 7, 2012. On June 6, 2012, the eve of the expiration of the Debtor's exclusive filing period, the Debtor filed its chapter 11 plan (the "Plan") and disclosure statement (the "Disclosure Statement"), the substantive terms of which had been under the exclusive direction and control of Gidumal.

121.    Despite advice to the contrary, Gidumal failed to negotiate with the Committee as to any of the terms of the Plan or the contents of the Disclosure Statement prior to their filing.

122.    By June 2012, the financial state of the Company had deteriorated to the point of the Debtor being out of cash; it had stopped paying bills owed to vendors, landlords, and professionals, and it had accrued obligations to provide furniture to customers from whom it accepted deposits, in some cases full payment, for

merchandise that it would never be able to deliver.  Upon information and belief, the

Debtor withheld payment for over five months from certain of its vendors who were

willing to provide the Debtor credit post-petition.

123.   Incredibly, despite this disastrous financial state of affairs, the Disclosure

Statement incorporated Gidumal's terms and unsupportable projection of a payout to

unsecured creditors of "100%" (less 20% depending on the Debtor's realization of

certain tax credits, which would then be paid over to current equity holders, including

Gidumal's fund).  According to the Debtor's proposed Disclosure Statement:

> [D]epending on the amount received from the Debtor's Assets, including
> the MDG Interest and CDS Interest, there is a reasonable likelihood that
> [current equity holders] may receive a distribution in the future . . . .  The
> limitation on the payment [of 80%] to Holders of Allowed Unsecured
> Claims is, in part, due to the delay in Interest Holders' being able to utilize
> a tax benefit by recognizing a potential loss of the value of their Interests
> upon Confirmation of the Plan, which in turn directly benefits Unsecured
> Creditors.

The "logic" underlying the 20% carve out from the return to unsecured creditors and

payment of that amount to equity was the result of the Chairman putting his fund's and

other shareholders' equity interests before the interest of creditors.

124.   Gidumal failed to explain, however, how the Company could achieve this

result when scheduled claims at that time totaled more than $26.5 million, filed claims

totaled approximately $38.5 million, and the Salus balance remained outstanding.

Interestingly, Gidumal stated in an email just one month later that he believed

RoomStore's asset value was a mere $15 million.   These facts demonstrate either

Gidumal's total lack of care and good faith or that the Disclosure Statement

misrepresents the prospects for the Debtor's reorganization created by the Chairman for personal gain.

125.    In a further effort to exert control for personal gain, and to extinguish known claims that had been asserted against him for breach of his fiduciary duties to the Company and estate, and thereby attempting to avoid personal liability for the significant financial harm he caused, Gidumal directed that under the terms of the Plan, that he and the other Board members would retain control over the disposition of the Debtor's remaining assets and would control the majority of the new Board of reorganized RoomStore.

126.    This majority control would have permitted him to continue his reign and thus maintain control over all causes of action of the Debtor's estate, including this breach of fiduciary duty claim against him, a claim that the Chairman was well aware of at the time because he had already received a notice of claims against him from the Committee and had directed the Company's general counsel to submit a General Liability Notice of Occurrence/Claim with RoomStore's D&O insurance carrier on March 23, 2012.  If the Company was sold or liquidated in an orderly fashion, Gidumal could not have obtained the release he so desperately desired.

127.    Predictably, the Debtor's professionals informed Gidumal that his terms would be viewed as offensive to the Committee and the DIP Lender, and more fundamentally, were objectionable under the Bankruptcy Code because it proposed paying equity holders, including his fund, prior to payment in full to the creditors.

### Gidumal's Misrepresentations, Irrationality, and Unfeasible Plan Forced
### Action by the DIP Lender and Committee

128.    Soon after Salus was provided with Gidumal's reckless Plan term sheet, Debtor's counsel notified the Chairman that Salus had summarily rejected it.   The Chairman responded in writing to such notification by accusing counsel of being "unconstructive [sic]" and in "panic mode," and further suggested that counsel should consider removing himself from the process.  The Chairman then questioned why in his view, Debtor's counsel "was incomprehensible in understanding . . . that Salus was absolutely scared to death to be the entity to pull the plug on this company" and unfoundedly suggested that FTI had worked with Salus to "encourage" a liquidation of the company.  Counsel responded by forwarding Gidumal's rant to Mr. Giordano and FTI with the single word: "Remarkable."  FTI shared the sentiment and view that the "train was off of the tracks."

129.    With Gidumal's gamble of a turnaround failing, he unilaterally decided to play "chicken" with the lender, an act blatantly fraught with recklessness because antagonizing the DIP lender could put an end to the reorganization process and force a fire sale liquidation once Salus terminated its funding of the Debtor and instead moved to enforce its legal rights.  In fact, it was not long after Salus was assigned the DIP Loan before RoomStore missed performance target requirements.  These misses required waivers of events of default under the DIP Loan.  Gidumal knew that if funding was restricted under the DIP Loan, the Company would be required to seek a sale of the Company or certain of its material assets, or to convert the Chapter 11 Case into a

liquidation under Chapter 7 of the Bankruptcy Code.  But, Gidumal had precluded any efforts to be prepared for a sale process so a liquidation fire sale would undoubtedly ensue.

130.    The events of default continued and RoomStore and Salus entered into no less than five amendments to the DIP Loan pursuant to which Salus waived certain events of default, decreased funds available to the Company, charged banking fees, and extended the time for the Company to file a plan of reorganization.    Certain amendments also added more stringent minimum sales requirements and in the event that the Company did not, on or before June 15, 2012, repay the DIP Loan in full or file a Chapter 11 plan in form and substance reasonably satisfactory to Salus, the Company was required to commence the sale of all of its assets.    Despite these draconian consequences, Gidumal still prevented the Company from preparing for an orderly sale process that would maximize value.

131.    Salus had not only experienced the Debtor consistently missing projections, but also the Debtor's failure to fund payroll on time for the wage period ending on June 29, 2012.  It had also failed to timely pay rent at a number of its stores despite receiving funds earmarked for rent from the purchaser of the Debtor's Dallas store assets.  Salus agreed to fund the payroll under the DIP Loan on an emergency basis, as well as the rent.

132.    During this same time period, the Chairman allowed the Debtor to engage in a practice of taking customer deposits for furniture sales with the knowledge that it was unable to fulfill those orders or provide refunds to customers.   Moreover, the

accounts payable increased dramatically, vendor payments and landlord rent aging had grown, professional fees increased, there were ongoing defaults under the DIP Loan, and cash held in trust for the payment of sales taxes was misappropriated to cover ongoing operational losses.  Clearly, this "melting ice cube" Debtor had degenerated into a mere puddle.

133.    By mid-July, in the face of the ongoing defaults under the DIP Loan, Salus lost patience with Gidumal's "accusatory tone and misrepresentation of facts" and "threatening 'chest beating.'"  Salus went so far as to communicate in writing to the Chairman expressing disbelief over his lack of comprehension as to the role of a secured lender of a debtor in bankruptcy.  The Chairman responded by blaming Salus for the Company's misfortune in not acceding to Gidumal's shocking request to provide yet another loan to RoomStore.  Salus then took the predicable step of declining to advance further funds until a meeting was held to discuss a structure for how to proceed in light of the events of default under the DIP Loan and the "uncertainty" of RoomStore's future and formally demanded that the Chairman call a Board meeting.  Tellingly, Salus asked the Chairman to "confirm that you have fulfilled your fiduciary responsibility and communicated this request to the members of the Board directly . . . ."

134.    Immediately thereafter, on or about July 18, 2012, consistent with the warning from the Debtor's counsel, and contrary to Gidumal's groundless belief to the contrary, Salus served notice on the Committee, the Debtor, and the United States Trustee that it has declared defaults under the DIP Loan and intended to exercise its rights against its collateral, which was Debtor's remaining assets. Thereafter, the

Committee petitioned the Bankruptcy Court for the appointment of a trustee to salvage whatever fire sale value remained in the Debtor's assets that had not already been wasted away by Gidumal through his willful and destructive misconduct.

<u>COUNT I</u>
**BREACH OF FIDUCIARY DUTIES**

135.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 134 above as if fully set forth herein.

136.    As a member of RoomStore's Board, Gidumal owed RoomStore fiduciary duties of care, loyalty, and good faith.  As a director of a debtor-in-possession under the Bankruptcy Code, Gidumal owed those duties as well as a duty of impartiality and a duty to protect, preserve, and maximize the value of RoomStore and its bankruptcy estate.  Gidumal breached these duties.

137.    Prior to and during the bankruptcy case, RoomStore was unable to pay its debts as they came due in the ordinary course.  As a result, the residual interest holders of RoomStore were its respective creditors, who became the beneficiaries of RoomStore's value.  Accordingly, Gidumal was required to exercise his fiduciary duties with the considered interest of RoomStore's creditors.

138.    Gidumal knew since at least the time he joined the Board that RoomStore faced a severe liquidity crisis, and that a corporate disposition or capital infusion was necessary in the near future to maximize and protect the value of the enterprise, and avoid its collapse.

139.   Gidumal further knew, or should have known, or was reckless in not knowing, that an efficient, prompt, and successful bankruptcy turnaround was dependent upon finding capital and financing or a buyer, and that a delay in executing those tasks would lead to the demise of RoomStore and an ongoing and continuing decline in its value.

140.   Despite this knowledge, Gidumal breached his fiduciary duties by failing to exercise that measure of care and diligence that an ordinary prudent person would exercise under similar circumstances, including failing to use reasonable diligence in gathering information and considering material information.  Moreover, he consciously disregarded material information reasonably available to him, including available options and proposals for sales of assets and/or the entire business as a going concern, capital opportunities available to support a turnaround, the value projected for a reorganized RoomStore and MDG, the ways to resolve projected shortfalls, and the decline in RoomStore's value as the delay and failed reorganization continued.  Instead, Gidumal acted in contravention of the interests of the Company, actively deflecting and failing throughout the bankruptcy case to assess or pursue alternate strategic alternatives and values by forcing a continued, failed turnaround of RoomStore as a cash burn continued and the furniture was thrown into the proverbial fire.

141.   Gidumal failed to undertake a proper and disinterested analysis of RoomStore's (i) prospect for a successful turnaround effort, (ii) the values ascribed to a reorganized RoomStore, (iii) orderly liquidation value compared to a distressed

sale, and (iv) strategic alternatives available to RoomStore to preserve value, including a going concern sale process.  Moreover, Gidumal was also reckless and grossly negligent, and willfully acted in bad faith, in failing to assess adequately, prepare for, and implement a contingency or alternative plan for preserving RoomStore's value if his chosen turnaround path failed to succeed, and when the Company showed an inability to meet projections and satisfy Gidumal's self-imposed condition of multiple months of improved performance, he refused and failed on a timely basis to change course to a going concern sale process or orderly liquidation, thereby causing RoomStore to incur additional, wasteful and unnecessary expense and a decline in its enterprise value to the detriment of its creditors.

142.    Moreover, Gidumal was willful, reckless and grossly negligent, and acted in bad faith, in implementing his chosen turnaround path by creating discord among bankruptcy constituents, misrepresenting facts, blocking the timely retention of an investment banker to pursue strategic alternative opportunities, failing to secure exit financing for RoomStore, and presenting an offensive and divisive proposed plan of reorganization.  Such actions and inaction continued despite a worsening financial crisis facing RoomStore during the relevant time periods discussed herein and the advice of independent experts, retained to guide RoomStore through this crisis, to the contrary.

143.    Gidumal also breached his fiduciary duties by overtly supplanting management and the full Board, and making decisions without adequate information or assessment by the full Board.  He, as Chairman, intentionally did not call Board

meetings for the Board's consideration of critical information and facts, and as a member of the Corporate Governance Committee of the Board, charged with overseeing proper corporate governance, refused to disclose his self-interest in pursuing the turnaround plan and attempting to secure ownership interests of RoomStore and/or MDG. Gidumal also failed to require assessment and decision making by a special or independent, disinterested committee of the Board, which excluded his participation.

144.    Through his position as a director of RoomStore, and as Chairman of the Board, Gidumal was vested with the responsibility to properly manage the operations and business affairs of RoomStore. As a fiduciary of RoomStore, Gidumal was required at all times to act in the best interests of RoomStore, with undivided loyalty and the utmost fidelity, and was prohibited from placing his own interests or those of other investors over those of RoomStore.

145.    Despite being self-interested in certain transactions, Gidumal failed to put into place corporate governance procedures to ensure that any strategic alternative, including a turnaround path, undertaken by RoomStore was entirely fair to the Company and its bankruptcy estate. The interests of Gidumal included a desire to obtain personal financial benefits and to be spared financial detriment that was not shared equally by the Company's stakeholders. For instance, Gidumal sought to continue a fanciful turnaround effort despite the known risks and decline in performance to obtain a return on his then-current equity interests, obtain personal gain through new ownership interests in RoomStore and/or MDG, and to reduce

personal liability.  Gidumal had been put on notice that his willful misconduct and reckless behavior created liability in light of his fiduciary obligations owed to the Company.  Gidumal's ill-conceived attempt to extinguish potential claims against him constitutes an illegitimate consideration in the exercise of his duties.  These personal interests led to disloyal conduct and a conscious, willful and reckless failure to act in the face of a known duty to act for RoomStore's benefit.

146.    Consistent with this disloyal focus on personal gain and self-protection, Gidumal abandoned, in a reckless, willful, grossly negligent and disloyal manner, consideration of the issues, alternatives and risks associated with RoomStore's path in bankruptcy.

147.    Defendant Gidumal's conduct in favoring his interests over the interests of RoomStore, as described above, constitutes a breach of the duty of loyalty owed to RoomStore and the RoomStore bankruptcy estate.

148.    The grossly negligent, disloyal, willful, bad faith, knowing and reckless conduct on the part of Gidumal, as described herein, constitutes a complete abdication of his fiduciary duties owed to the Company.  Through his bad faith, disloyalty, and knowing and conscious disregard of the risks to RoomStore and its bankruptcy estate, Gidumal improperly and wrongfully delayed assessing and implementing strategic alternatives available to RoomStore, or an orderly liquidation to preserve value, and thus caused RoomStore to (i) deplete its assets, (ii) incur increased debt, and (iii) reduce its enterprise value.

149.    As a direct, proximate and substantial result of his misconduct, RoomStore and its creditors, derivatively, suffered damages in an amount not less than $16,500,000 million in compensatory damages.  The result of Gidumal's willful misconduct was inimical to RoomStore and its bankruptcy estate.

### COUNT TWO
### TO AVOID PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(B) AND RECOVER PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C.  § 550

150.    The Trustee adopts and incorporates by reference the allegations in Paragraphs 1 through 149 above as if fully set forth herein.

151.    Gidumal was at all times relevant to this Complaint an insider of the Debtor as that term is defined in section 101(31) of the Bankruptcy Code.

152.    During the 90-day period prior to the Petition Date (the "Preference Period"), the Debtor made transfers to or for the benefit of Gidumal, including a payment by wire on November 4, 2011 in the amount of $25,000, together with any other payments that may be subsequently identified (collectively, the "Transfers").[1]

153.    The Transfers were transfers of cash of the Debtor which was an interest of the Debtor's property, and were made for or on the account of an antecedent debt owed by the Debtor to Gidumal at the time of the Transfers.

154.    At the time of the Transfers, the Debtor was insolvent (as that term is defined and used in sections 101(32) and 547 of the Bankruptcy Code).

---

[1]    Exhibit A reflects the Trustee's current knowledge of the Transfers (made by check, wire transfer or their equivalent) to Gidumal during the Preference Period.  During the course of this proceeding, the Trustee may learn (through discovery or otherwise) of additional transfers made to Gidumal during the Preference Period.  It is the Trustee's intention to avoid and recover all such transfers, whether such transfers are presently reflected on Exhibit A or not.  Accordingly, the Trustee reserves her rights to supplement and/or amend this information as necessary and appropriate.

155.    As a result of the Transfers, Gidumal received more than he would have received if the Debtor's bankruptcy case was a case under chapter 7 of the Bankruptcy Code, the Transfers had not been made, and Gidumal had received payment on his debts to the extent provided by the provisions of the Bankruptcy Code.

156.    Gidumal was the initial transferee of the Transfers.

157.    The Transfers constitute avoidable preferential transfers under 11 U.S.C. § 547 and the Transfers are recoverable from Gidumal pursuant to 11 U.S.C. § 550.

WHEREFORE, the Plaintiff Trustee requests that:

a.    On Count One, judgment be entered against Defendant Steven L. Gidumal in an amount not less than $16,500,000 plus attorneys' fees and costs in an amount to be determined at trial;

b.    On Count Two, avoiding the Transfers as preferential transfers pursuant to section 547 of the Bankruptcy Code and entering judgment against Gidumal pursuant to section 550 of the Bankruptcy Code in the amount of $25,000.00, plus pre-judgment interest, costs, attorneys' fees, and such other and further amounts as may be proven at trial; and

c.    On All Counts, that the Court grant such other and further relief as it deems just and proper.

By her attorneys,

Kevin G. Hroblak
Edward M. Buxbaum
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Suite 1800
Baltimore, Maryland  21202
(410) 347-9405
(410) 223-4305 (fax)
*Pro hac admission to be requested*

and

 /s/ Bradford F. Englander
Bradford F. Englander (VSB# 36221)
Whiteford, Taylor & Preston L.L.P.
3190 Fairview Park Drive
Suite 300
Falls Church, Virginia  22042
(703) 280-9260
(703) 280-9139 (fax)

*2072651*